RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*

　　*v.*

FRANKLIN WOODS,

　　　　　　　　*Defendant-Appellant.*

No. 07-5463

————————————

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 05-00036—Curtis L. Collier, Chief District Judge.

Argued: March 11, 2010

Decided and Filed: April 27, 2010

Before: KENNEDY, MOORE, and SUTTON, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Charles Patrick Dupree, LAW OFFICE, Chattanooga, Tennessee, for Appellant. Mel Andrew Schwing, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Charles Patrick Dupree, LAW OFFICE, Chattanooga, Tennessee, for Appellant. Scott A. Winne, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

————————————

## OPINION

————————————

KENNEDY, Circuit Judge. Defendant appeals his sentence of 108 months imprisonment for his conviction on one count of manufacturing methamphetamine. We AFFIRM the district court's application of an enhancement under the sentencing guidelines for reckless endangerment during flight. However, because the district court's finding that the possession of a firearm by a co-conspirator was reasonably foreseeable is without

1

evidentiary support and therefore is clearly erroneous, we VACATE and REMAND for resentencing.

### FACTUAL BACKGROUND

In early March, 2005, the Hamilton County, Tennessee Sheriff's Office received a tip from the Georgia Bureau of Investigation that an individual driving a vehicle registered to codefendant Donald Owens had purchased a suspiciously large amount of iodine solution from a feed store in Georgia. Because iodine solution is utilized in the manufacture of methamphetamine, several officers began surveillance on Owens's residence.

Over a span of thirty minutes on March 10, 2004, four individuals, including defendant, left the home in three vehicles. Each was quickly arrested. Billy Woods, defendant's brother and codefendant, was the first to leave. When he was stopped, officers found him sitting in his truck on a loaded handgun and in possession of several grams of methamphetamine. A short time later, Owens was also pulled over and arrested.

Defendant and codefendant James Boyd were the last to leave the residence. They left in a white pickup truck driven by defendant, and were followed by detective Marty Dunn in an unmarked vehicle, which was followed by officer Robin Langford in an unmarked green car. As defendant drove onto a highway on-ramp, Dunn, who was two car lengths behind defendant's truck, activated a blue strobe light sitting on the dashboard of his vehicle as well as an audible siren. Langford testified at defendant's sentencing that the light is visible "[f]rom a distance." The truck briefly slowed down and pulled over onto the shoulder, but did not stop.

Langford testified that he also activated a blue strobe light on the dashboard of his vehicle, and passed Dunn and pulled parallel to defendant's truck. At this point, the truck veered into Langford's vehicle, and accelerated. Dunn's car then struck defendant's vehicle, causing it to spin sideways briefly, and Langford hit the passenger side door. Defendant regained control of his vehicle, accelerated, and drove onto the highway, across the grass median, and was ultimately detained.

A short time later, police obtained a search warrant and searched the residence. Inside a bedroom, they found laboratory equipment and materials consistent with a large

methamphetamine manufacturing operation. In the living room that was connected to the bedroom, officers found a backpack that contained two firearms, at least one of which was loaded, and a knife. No fingerprint tests were performed, and officers were not able to ascertain the owner.

Defendant, Owens, Boyd, and Billy Woods were indicted on charges of manufacturing more than fifty grams of methamphetamine. In the process of negotiating a plea, Owens told the government that defendant was the cook, although the cooks took place at Owens' house. Owens insisted that he and the other conspirators were simply the couriers, going out to purchase ingredients to be used by defendant. However, the investigation did not turn up any evidence that defendant lived in the house or had any interest in the house, which was actually owned by Owens's mother, whose employment kept her away from home for extended periods.

Defendant and his coconspirators pleaded guilty to one count of conspiracy to manufacture fifty grams or more of methamphetamine. The district court held defendant responsible for 53.64 grams of pseudoephedrine, a precursor to methamphetamine. Section 2D1.1(c) of the sentencing guidelines provide that 1 gram of pseudoephedrine is to be treated as equivalent to 10 kilograms of marihuana for purposes of calculating the offense level. This conversion led to defendant being responsible for 536.4 kilograms of a marijuana equivalent, giving him a base offense level of 28. USSG § 2D1.1(c)(6).

The district court also found that defendant was eligible for a two-point enhancement under USSG § 2D1.1(b)(1) because a dangerous firearm was possessed in connection with the conspiracy. Although the district court found that there was no evidence that defendant had ever possessed a firearm, it concluded that it was "reasonably foreseeable" that a conspirator would possess a firearm given the "substantial" and "large quantity of methamphetamine being made." The district court noted that the conspirators had been producing the methamphetamine over three days in the same residence where the firearms were located and defendant's role in the conspiracy was substantial.

The district court also applied a two-point enhancement under USSG §3C1.2 based on the defendant's flight from the arresting officers. Defendant's offense level was reduced by three points based on his acceptance of responsibility. USSG § 3E1.1. Without

objection, the district court concluded that defendant's criminal history fell within category III. This led to a guideline range of 108-135 months imprisonment. The district court sentenced defendant to 108 months. Defendant appeals.

## STANDARD OF REVIEW

"Appellate courts review a district court's sentencing determinations for abuse of discretion." *United States v. Rosenbaum*, 585 F.3d 259, 266 (6th Cir. 2009) (citing *Gall v. United States*, 552 U.S. 38 (2007)). "[A] district court abuses its discretion when it commits a 'significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" *United States v. Bates*, 552 F.3d 472, 476 (6th Cir. 2009) (quoting *Gall*, 552 U.S. at 51). "This Court reviews the district court's factual findings in calculating the Guidelines range for clear error, but its legal conclusions are reviewed de novo." *United States v. Thompson*, 586 F.3d 1035, 1038 (6th Cir. 2009) (citing *United States v. Galloway*, 439 F.3d 320, 322 (6th Cir. 2006)).

## DISCUSSION

### I. Firearm Enhancement

Defendant first contends that the district court erroneously applied the enhancement for possession of a firearm under USSG § 2D1.1(b)(1), which provides that two points are to be added to the defendant's offense level "[i]f a dangerous weapon (including a firearm) was possessed." The government concedes that there is no evidence that defendant ever possessed a firearm himself or even was actually aware that the firearm was present. Under such circumstances, the possession of a firearm by a coconspirator must (1) be connected to the conspiracy and (2) be reasonably foreseeable. USSG § 1B1.3(b)(1)(B); *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994).

The government argues that, because the weapon was "present" at the site of the drug manufacturing, we must presume that it is attributable to defendant "unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1, comment. n.3. The government is mistaken. This provision deals only with the question of whether a

firearm is connected to the offense. *United States v. Johnson*, 344 F.3d 562, 565 (6th Cir. 2003). It has no bearing on the additional requirement that the presence of such a firearm must also be reasonably foreseeable to the defendant. *See* USSG § 1B1.3(b)(1)(B) (providing that the sentencing court may take into account "in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity"); *Cochran*, 14 F.3d at 1133 ("'[M]ere presence on the scene plus association with illegal possessors is not enough'" (quoting *United States v. Birmley*, 529 F.2d 103, 107 (6th Cir. 1976)). Defendant admits that the firearms found in a backpack near the site of their cooking operation were connected to the conspiracy.

This leaves unanswered whether it was reasonably foreseeable to defendant that a co-conspirator would possess a firearm. It was the government's burden to prove this fact by a preponderance of the evidence. *United States v. Walker*, 160 F.3d 1078, 1090 (6th Cir. 1998). "Whether a co-conspirator's actions were reasonably foreseeable is a factual finding reviewed for clear error." *United States v. Dupree*, 323 F.3d 480, 490 (6th Cir. 2003) (quoting *United States v. Tisdale*, 952 F.2d 934, 938 (6th Cir. 1992)).

To find that it was reasonably foreseeable that someone would possess a firearm, the district court relied on an inference that if a drug conspiracy involves a "substantial" amount of drugs, a defendant should foresee that a co-conspirator is likely to possess firearms. Our cases "have explicitly rejected 'the fiction that a firearm's presence always will be foreseeable to persons participating in illegal drug transactions.'" *United States v. Catalan*, 499 F.3d 604, 607 (6th Cir. 2007) (citing *Cochran*, 14 F.3d at 1133). "[A]t a minimum, we require that there be objective evidence that the defendant . . . at least knew it was reasonably probable that his coconspirator would be armed." *Cochran*, 14 F.3d at 1133.

Thus, we have declined to find clear error in a district court's conclusion that possession of a firearm was reasonably foreseeable when there are massive amounts of drugs in a single location. *See United States v. Benson*, 591 F.3d 491, 505 (6th Cir. 2010) (affirming district court's application of firearm enhancement to defendant involved in a conspiracy where police found nearby 20 kilograms of cocaine, 40 pounds of marijuana, and over $200,000 in cash in a single location); *see also United States v. Odom*, 13 F.3d 949, 959

(6th Cir. 1994) (finding sufficient evidence to support a conviction for co-conspirator conduct under 18 U.S.C. § 924(c) where evidence established defendant received $90,000 in cash and possessed at least 5 kilograms of cocaine); *United States v. Christian*, 942 F.2d 363, 366-67 (6th Cir. 1991) (finding sufficient evidence to support a conviction for co-conspirator conduct under 18 U.S.C. § 924(c) where defendant was in a vehicle with $60,000 worth of cocaine), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995). Each of these cases involved narcotics worth at least $60,000 located near the firearm. In contrast, we have been unable to affirm a finding of foreseeability when the amount of narcotics is lower. *United States v. Wade*, 318 F.3d 698, 702 (6th Cir. 2003); *Cochran*, 14 F.3d at 1133. Here, defendant was held responsible for fifty grams of a precursor to methamphetamine. Even assuming that 53.64 grams of pseudoephedrine makes approximately that much methamphetamine, this is not a massive quantity of narcotics that, by itself, supports an inference of weapons. The government – which had the burden of proof before the district court – did not introduce any evidence that these drugs had significant value. *Compare United States v. Collier*, 246 F. App'x 321, 326 (6th Cir. 2007) (noting expert's testimony that 55 grams of methamphetamine would sell for approximately $5,000). The amount of narcotics found in this case is "a far cry from the huge quantities involved when we have found firearm possession to be foreseeable." *Wade*, 318 F.3d at 702. Were we to indulge the inference that the presence of few thousand dollars worth of methamphetamine (here, a precursor to methamphetamine) makes the presence of firearms inherently foreseeable, we would be effectively resurrecting the "fiction" about a link between guns and drugs our cases have "explicitly rejected." *Catalan*, 499 F.3d at 607.

When there are not "huge quantities" of narcotics near the weapon, we have insisted upon additional evidence that defendant expected a firearm to be present. *Wade*, 318 F.3d at 702. The lowest amount the Sixth Circuit has found that supports the inference is *Catalan*, which involved drugs valued at $20,000. But in *Catalan*, there was additional evidence which supported the finding that the defendant knew about the firearm. *See Catalan*, 499 F.3d at 607 (noting that when police arrived, defendant fled to room where the gun was located in plain view and struggled with officers in an effort to prevent them from entering). In *United States v. Gross*, 77 F. App'x 338, 344 (6th Cir. 2003), we found that the "most important[]" fact was not the amount of narcotics involved – several kilograms of cocaine

over the course of defendant's relationship with the firearm possessor – but the fact that defendant owned a bulletproof vest, which supplied the objective evidence that defendant foresaw danger from firearms during his drug transactions.

In the present case, nothing else in the record supports the enhancement. The fact that the manufacturing operation extended over three days has no obvious relevance to the foreseeability of weapon possession. There is no evidence that three days of production implies that there was a larger quantity of narcotics on the premises at any one time. To the contrary, the government only attributed a small amount of illegal substances to the conspiracy, and the fact that the conspirators toiled for days to produce it implies only an inefficient production method. And there is no objective evidence that defendant otherwise expected a firearm to be present, by, for example, telling his companions to bring a firearm, *see United States v. Galvan*, 453 F.3d 738, 742-43 (6th Cir. 2006), being arrested in a room with a firearm in plain view, *see Catalan*, 499 F.3d at 607; *United States v. Williams*, 176 F.3d 301, 308 (6th Cir. 1999); *Wade*, 318 F.3d at 703, or being involved in drug transactions with firearms present in the past, *see United States v. Ward*, 506 F.3d 468, 475 (6th Cir. 2007); *Wade*, 318 F.3d at 704.

The deference extended to district courts to find sentencing facts is not boundless. In this case, the government did not introduce any objective evidence (including any evidence of the value of drugs recently manufactured), and the inference that we have used to affirm previous enhancements cannot be extended to salvage defendant's sentence. We emphasize again that the government is not relieved of its burden of proof under USSG § 2D1.1(b) simply because defendant is involved in the drug trade.[1] The district court committed clear error by finding that defendant should have reasonably foreseen that a co-conspirator would possess firearms, absent any evidence supporting that finding.

---

[1] In fact, the government did not even argue to the district court that the defendant could reasonably foresee the possession of a firearm. Instead, the government simply asserted, incorrectly, "Anytime a weapon is utilized by one conspirator, it is legally attributable to another coconspirator as something that is foreseeable and part of the knowledge of the ongoing activities of the enterprise."

## II.  Reckless Endangerment During Flight Enhancement

Defendant's next assignment of error is to the district court's enhancement of his sentence guidelines range based on his flight from the arresting officers.  The Guidelines provide that the offense level should be increased by two levels "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer."  USSG § 3C1.2.

> [T]he government must show that the defendant (1) recklessly, (2) created a substantial risk of death or serious bodily injury, (3) to another person, (4) in the course of fleeing from a law enforcement officer, (5) and that this conduct occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

*United States v. Dial*, 524 F.3d 783, 786-87 (6th Cir. 2008) (internal quotations omitted). "While the question of what constitutes endangerment is a mixed question of law and fact, it is highly fact-based.  Therefore, significant deference to the district court is required."  *United States v. Hazelwood*, 398 F.3d 792, 796 (6th Cir. 2005) (citing *United States v. Ennenga*, 263 F.3d 499, 502 (6th Cir. 2001)).

Defendant does not dispute that he acted recklessly or that his conduct created a substantial risk of death or serious bodily injury to another person.  Although defendant did not engage in the sort of high speed driving that typically supports an endangerment finding, *Hazelwood*, 398 F.3d at 796 (collecting cases), there was evidence that he rammed his car into another vehicle, which is sufficient to support the district court's finding that defendant recklessly created a substantial risk of serious bodily injury.  *See Dial*, 524 F.3d at 787-88.

On appeal, defendant does not dispute that he fled from the officers, but argues that he could not have known that the vehicles he attempted to evade were law enforcement.  It is true that "[i]n order for [section 3C1.2] to apply, defendant must know or have reason to know that he is fleeing from a law enforcement officer."  *United States v. Hayes*, 135 F.3d 435, 438 (6th Cir. 1998). However, there was ample evidence supporting the district court's finding that defendant should have known that he was

pursued by police officers. There was testimony at the sentencing that the two unmarked law enforcement vehicles had blue strobe lights that were activated. *See Hayes*, 135 F.3d at 439 (finding that defendant had reason to know he was fleeing from law enforcement when, among other things, the unmarked vehicle that pursued him contained a strobe light). Moreover, as defendant argued before the district court, defendant's initial conduct of slowing down and pulling over was consistent with that of a person who thought that an officer sought to pass him. The evidence presented is sufficient to support the district court's application of the enhancement for reckless endangerment during flight.[2]

## CONCLUSION

Therefore, we AFFIRM the district court's application of the enhancement for reckless endangerment during flight, but we VACATE defendant's sentence and REMAND for resentencing consistent with this opinion.

---

[2]In light of our remand, we do not address the other issues raised by defendant in his appeal since they require resolution of the remand on the firearm enhancement.